UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

     - v. -

OUMAR ISSA,
HAROUNA TOURÉ, and
IDRISS ABDELRAHMAN,

        Defendants.

- - - - - - - - - - - - - - - - - - -X



    09 Cr.

## 09 CRIM 1244

### COUNT ONE

#### NARCO-TERRORISM CONSPIRACY

The Grand Jury charges:

#### BACKGROUND TO THE CONSPIRACY

##### *Fuerzas Armadas Revolucionarias de Colombia*

1.     From in or about 1964 until on or about the date of filing of this Indictment, the Fuerzas Armadas Revolucionarias de Colombia (the "Revolutionary Armed Forces of Colombia" or "FARC") has been and is an international terrorist group dedicated to the violent overthrow of the democratically elected Government of Colombia.  To further its terrorist activities, the FARC actively engages in narcotics trafficking as a financing mechanism and has evolved into the world's largest supplier of cocaine.  The FARC is a highly structured terrorist organization, which is styled as a military group and comprised of approximately 12,000 to 18,000 armed guerillas.

2.    The FARC was designated as a foreign terrorist organization ("FTO") in October 1997 by the United States Secretary of State and remains so designated as of the date of the filing of this Indictment.

3.    During at least the five years prior to the date of the filing of this Indictment, the FARC has directed violent acts against United States persons and commercial and property interests in foreign jurisdictions, including, but not limited to, Colombia.  In particular, the FARC leadership has ordered FARC members to kidnap and murder United States citizens and to attack United States interests in order to dissuade the United States from continuing its efforts to assist the Colombian government's initiative to fumigate and disrupt the FARC's cocaine and cocaine paste manufacturing and distribution activities.  The FARC's violent acts directed against the United States and United States interests have included: (1) the murder of United States nationals; (2) the kidnapping of United States nationals; and (3) the bombing of a restaurant in Bogota, Colombia, frequented by United States nationals.

*Al Qaeda and*
*Al Qaeda in the Islamic Maghreb*

4.    Al Qaeda is an organization founded in or about 1989 by Usama bin Laden, Muhammad Atef, a/k/a "Abu Hafs al Masri," and others.  One of the principal goals of this organization is to attack the United States.  Al Qaeda has

-2-

claimed responsibility for the September 11, 2001 attacks in the United States and for numerous other terrorist acts around the world. Al Qaeda functions independently and through various terrorist organizations that share its ideology and operate under its umbrella, including, as described below, Al Qaeda in the Islamic Maghreb ("AQIM"), which operates primarily in Northwest Africa.

5. On October 8, 1999, the United States Secretary of State designated Al Qaeda as an FTO, and Al Qaeda remains a designated FTO as of the date of the filing of this Indictment.

6. AQIM was formerly known as the Salafist Group for Preaching and Combat ("GSPC"). This group was founded in the late 1990s with the assistance of Usama bin Laden, and declared war on Algeria's secular authorities and Western targets. In or about September 2001, GSPC declared that it would "strike hard" at the United States and other countries if they "persist in hunting down Islamist networks in America, Great Britain, France, and Belgium." On March 27, 2002, the United States Secretary of State designated GSPC as an FTO, pursuant to Section 219 of the Immigration and Nationality Act.

7. On or about September 11, 2006, Ayman al Zawahiri – a high-ranking member of Al Qaeda and close associate of Usama bin Laden – announced that GSPC had joined Al Qaeda. In making this statement, Zawahiri called for "our brothers of the GSPC to hit the foundations of the Crusader alliance, primarily their old

leader the infidel United States."  GSPC renamed itself AQIM, and in or about February 2008, the United States Secretary of State amended the earlier designation of GSPC as an FTO to include AQIM.

STATUTORY ALLEGATIONS

8.    From at least in or about September 2009, up to and including in or about December 2009, in an offense occurring in and affecting interstate and foreign commerce, begun and committed outside of the jurisdiction of any particular State or district of the United States, OUMAR ISSA, HAROUNA TOURÉ, and IDRISS ABDELRAHMAN, the defendants, who were first brought to and arrested in the Southern District of New York, and others known and unknown, unlawfully, intentionally and knowingly did combine, conspire, confederate and agree together and with each other to violate the laws of the United States.

9.    It was a part and an object of said conspiracy that OUMAR ISSA, HAROUNA TOURÉ, and IDRISS ABDELRAHMAN, the defendants, and others known and unknown, would and did engage in conduct that would be punishable under Title 21, United States Code, Section 841(a) if committed within the jurisdiction of the United States, to wit, the distribution, and possession with the intent to distribute, of five kilograms and more of mixtures and substances containing a detectable amount of cocaine, knowing and intending to provide, directly and indirectly, something of

-4-

pecuniary value to a person and organization that has engaged and engages in terrorist activity and terrorism, to wit, the FARC, which was designated by the United States Secretary of State as a foreign terrorist organization in October 1997, pursuant to Section 219 of the Immigration and Nationality Act, and was re-designated as such on October 2, 2003, and October 11, 2005, and is currently designated as such as of the date of the filing of this Indictment, and its members, operatives and associates, in violation of Section 960a of Title 21, United States Code.

10.   It was further a part and an object of said conspiracy that OUMAR ISSA, HAROUNA TOURÉ, and IDRISS ABDELRAHMAN, the defendants, and others known and unknown, would and did engage in conduct that would be punishable under Title 21, United States Code, Section 841(a) if committed within the jurisdiction of the United States, to wit, the distribution, and possession with the intent to distribute, of five kilograms and more of mixtures and substances containing a detectable amount of cocaine, knowing and intending to provide, directly and indirectly, something of pecuniary value to a person and organization that has engaged and engages in terrorist activity and terrorism, to wit, (a) Al Qaeda, which was designated by the United States Secretary of State as a foreign terrorist organization on October 8, 1999, pursuant to Section 219 of the Immigration and Nationality Act, and was re-designated as such on

October 5, 2001, October 2, 2003, and April 28, 2006, and is currently designated as such as of the date of the filing of this Indictment, and its members, operatives and associates, in violation of Section 960a of Title 21, United States Code; and (b) AQIM, which was designated by the United States Secretary of State as a foreign terrorist organization in February 2008, pursuant to Section 219 of the Immigration and Nationality Act, and is currently designated as such as of the date of the filing of this Indictment, and its members, operatives and associates, in violation of Section 960a of Title 21, United States Code.

<u>Overt Acts</u>

11.   In furtherance of the conspiracy and to effect the illegal objects thereof, the following overt acts, among others, were committed:

a.   On or about September 14, 2009, in Ghana, a DEA confidential source ("CS-1") purporting to represent the FARC, met with OUMAR ISSA, the defendant, to discuss whether ISSA could assist the FARC in transporting a large load of cocaine from West Africa, through the African desert, and into Spain. ISSA stated that his associates in Mali have established routes to transport contraband and confirmed that the routes are protected by Al Qaeda.  During the meeting, CS-1 explained to ISSA that the FARC shared the same anti-American views held by ISSA and stated that the proposed cocaine transportation

-6-

arrangement would be profitable and would help to finance their shared causes.

b.      On or about September 15, 2009 and September 16, 2009, CS-1 and ISSA engaged in a series of telephone calls in which they further discussed the proposed cocaine shipment, which ISSA said he would discuss with his boss.

c.      On or about October 6, 2009, in Ghana, CS-1 met with ISSA and HAROUNA TOURÉ, the defendant, on multiple occasions.  In the meetings, TOURÉ, whom ISSA introduced as his boss, informed CS-1 that TOURÉ's organization would be able to secure safe passage of the FARC's cocaine from Mali to Morocco, and that the transportation of the cocaine across the desert would be facilitated by Al Qaeda groups in North Africa.  TOURÉ stated that he led a criminal organization that worked with Al Qaeda groups, and that he also provides financial support and other assistance to Al Qaeda.  TOURÉ further stated that he understood the FARC's hatred for the Americans.  TOURÉ negotiated a transportation fee from CS-1 of $2,000 per kilogram of cocaine, which included payment to TOURÉ's Al Qaeda contacts for the transport and security of the cocaine through North Africa. TOURÉ also told CS-1 that he could obtain official Malian passports.  At the request of CS-1, TOURÉ offered to provide a Malian passport for a criminal associate of CS-1 (the "CA"), whom TOURÉ agreed could accompany the cocaine shipment as far as Mali.

d.    On or about October 16 and October 17, 2009, CS-1 and TOURÉ exchanged a series of e-mails to further arrange a a meeting between a purported high-ranking member of the FARC and a representative of the group that would protect the cocaine in transit through the desert.

e.    On or about November 17 and November 18, 2009, CS-1 and a second DEA confidential source ("CS-2"), who purported to be a high-ranking member of the FARC interested in shipping a series of cocaine loads of 500 to 1000 kilograms across Africa to Europe, met in Ghana with TOURÉ and IDRISS ABDELRAHMAN, the defendant, who was introduced to CS-1 and CS-2 as the leader of a militia.  During the meetings, TOURÉ explained to CS-1 and CS-2 that he would use a truck to transport the cocaine from Ghana to Mali or Niger, where he would meet with ABDELRAHMAN and his militia, who would then provide safe passage of the cocaine through the desert to the coast of Morocco. ABDELRAHMAN stated that his people had the force, weapons, and vehicles necessary to do so.  TOURÉ and ABDELRAHMAN also informed CS-1 and CS-2 that they would charge them 3,000 euros per kilogram to transport the cocaine, a cost that would cover, among other things, payments to people responsible for protecting the drug shipment in the desert.  During the meetings, CS-1 and ABDELRAHMAN discussed their shared hatred of Americans and their commitment to a mutual cause.

-8-

f.    On or about November 18, 2009, in Ghana, CS-1 and CS-2 provided TOURÉ and ABDELRAHMAN with $25,000 to purchase a truck that would be used to transport the cocaine across the desert.

g.    On or about November 18, 2009, and November 19, 2009, CS-1 and CS-2 engaged in a series of telephone calls with TOURÉ and ABDELRAHMAN to further plan and coordinate the proposed cocaine shipments.

h.    On or about November 30, 2009, TOURÉ and ABDELRAHMAN informed CS-1 by telephone that they had purchased a truck to transport the cocaine, and that the recent kidnaping of a Spanish national in Mauritania and the recent discovery of a large amount of cocaine in an airplane that had crashed in Mali would not interfere with their plan to transport the FARC's cocaine through the desert.

i.    On or about December 13, 2009, TOURÉ and ABDELRAHMAN met with CS-1 and CS-2 in Ghana and informed them that they needed an additional 15,000 euros to make modifications to the truck they had purchased in order to better conceal the load of cocaine.    TOURÉ and ABDELRAHMAN also stated that they required 75,000 euros as a down payment for the shipment.    TOURÉ also provided CS-1 and CS-2 with a Malian passport and a Malian government identification card for the CA, which would enable the CA to accompany the cocaine shipment to Mali, as previously

-9-

discussed.

j.    On or about December 14, 2009, TOURÉ and ABDELRAHMAN met with CS-1 and CS-2 in Ghana.  During the meeting, TOURÉ explained that he and ABDELRAHMAN had made substantial preparations for the cocaine transportation including the purchase of off-road vehicles to move the cocaine through the desert and the preparation of people along the transportation route who would assist with the transportation.  TOURÉ also stated that he had brought to Ghana a driver who works for Al Qaeda who would help drive the vehicles through the desert.

k.    On or about December 15, 2009, CS-1 and CS-2 met with TOURÉ and ABDELRAHMAN at a car lot in Ghana to inspect the truck that TOURÉ and ABDELRAHMAN had purchased to transport the cocaine.  CS-1 and CS-2 provided TOURÉ and ABDELRAHMAN with the 15,000 euros that they had previously requested to modify the truck, and agreed to meet the following day in order to load the cocaine onto the truck.

(Title 21, United States Code, Section 960a and Title 18, United States Code, Section 3238.)

COUNT TWO

CONSPIRACY TO PROVIDE MATERIAL SUPPORT
TO A FOREIGN TERRORIST ORGANIZATION

The Grand Jury further charges:

BACKGROUND TO THE CONSPIRACY

12.   Paragraphs 1 through 7 are incorporated herein as if re-alleged in full.

STATUTORY ALLEGATIONS

13.   From at least in or about September 2009, up to and including in or about December 2009, in an offense occurring in and affecting interstate and foreign commerce, begun and committed outside of the jurisdiction of any particular State or district of the United States, OUMAR ISSA, HAROUNA TOURÉ, and IDRISS ABDELRAHMAN, the defendants, who were first brought to and arrested in the Southern District of New York, and others known and unknown, unlawfully and knowingly did combine, conspire, confederate and agree together and with each other to provide "material support or resources," as that term is defined in Title 18, United States Code, Section 2339A(b), to the FARC, Al Qaeda, and AQIM, each of which has been designated by the United States Secretary of State as a foreign terrorist organization, as set forth above.

14.   It was a part and an object of the conspiracy that OUMAR ISSA, HAROUNA TOURÉ, and IDRISS ABDELRAHMAN, the defendants, and others known and unknown, would and did agree to

-11-

provide the FARC with services, including, among other things, logistical assistance and secure transportation for a shipment of cocaine across Africa, false identification documents, and other material support and resources, knowing that the FARC had engaged and was engaging in terrorist activity (as defined in section 212(a)(3)(B) of the Immigration and Nationality Act), and that the FARC had engaged and was engaging in terrorism (as defined in section 140(d)(2) of the Foreign Relations Authorization Act, Fiscal Years 1988 and 1989), in violation of Title 18, United States Code, Section 2339B.

15.    It was further a part and an object of the conspiracy that OUMAR ISSA, HAROUNA TOURÉ, and IDRISS ABDELRAHMAN, the defendants, would and did agree to provide material support and resources, including, among other things, property, currency, and monetary instruments, to Al Qaeda and AQIM, knowing that Al Qaeda and AQIM had engaged and were engaging in terrorist activity (as defined in section 212(a)(3)(B) of the Immigration and Nationality Act), and that Al Qaeda and AQIM had engaged and were engaging in terrorism (as defined in section 140(d)(2) of the Foreign Relations Authorization Act, Fiscal Years 1988 and 1989), in violation of Title 18, United States Code, Section 2339B.

Overt Acts

16.    In furtherance of the conspiracy and to effect the illegal object thereof, OUMAR ISSA, HAROUNA TOURÉ, and IDRISS ABDELRAHMAN, the defendants, and others known and unknown, committed the overt acts set forth in paragraph 11 of this Indictment, which are fully incorporated by reference herein.

(Title 18, United States Code, Sections 2339B(a)(1), (d)(1)(C), (d)(1)(E) and 3238.)

FORFEITURE ALLEGATION

(As to Count One)

17.    As a result of committing the controlled substance offense alleged in Count One of this Indictment, OUMAR ISSA, HAROUNA TOURÉ, and IDRISS ABDELRAHMAN, the defendants, shall forfeit to the United States, pursuant to Title 21, United States Code, Sections 853 and 970, any and all property constituting or derived from any proceeds that the defendants obtained directly or indirectly as a result of the offense and any and all property used or intended to be used in any manner or part to commit and to facilitate the commission of the offense alleged in Count One of this Indictment, including, but not limited to, a sum of money representing the amount of proceeds obtained as a result of the offense described in Count One of this Indictment.

-13-

Substitute Assets Provision

18.  If any of the property described above as being subject to forfeiture, as a result of any act or omission of the defendants:

        a.    cannot be located upon the exercise of due diligence;

        b.    has been transferred or sold to, or deposited with, a third person;

        c.    has been placed beyond the jurisdiction of the Court;

        d.    has been substantially diminished in value; or

        e.    has been commingled with other property which cannot be subdivided without difficulty;

it is the intention of the United States, pursuant to Title 21, United States Code, Sections 853(p) and 970, to seek forfeiture of any other property of the defendants up to the value of the above forfeitable property.

(Title 21, United States Code, Sections 853 and 970.)

FORFEITURE ALLEGATION

(As to Count Two)

19.  As a result of planning and perpetrating the Federal crime of terrorism against the United States, citizens and residents of the United States, and their property alleged in

-14-

Count Two of this Indictment, OUMAR ISSA, HAROUNA TOURÉ, and IDRISS ABDELRAHMAN, the defendants, shall forfeit to the United States, pursuant to Title 18, United States Code, Sections 981(a)(1)(G) and 2332b(g)(5), and Title 28, United States Code, Section 2461:

    a.   all right, title, and interest in all assets, foreign and domestic;

    b.   all right, title, and interest in all assets, foreign and domestic, affording a source of influence over the FARC, Al Qaeda, and AQIM;

    c.   all right, title and interest in all assets, foreign and domestic, acquired and maintained with the intent and for the purpose of supporting, planning, conducting, and concealing a Federal crime of terrorism against the United States, citizens and residents of the United States, and their property; and

    d.   all right, title and interest in all assets, foreign and domestic, derived from, involved in, and used and intended to be used to commit a Federal crime of terrorism against the United States, citizens and residents of the United States, and their property;

including, but not limited to, a sum of money representing the

value of the property described above as being subject to

forfeiture.

(Title 18, United States Code, Section 981(a)(1)(G) and
2332b(g)(5) and Title 28, United States Code, Section 2461.)


FOREPERSON

PREET BHARARA
United States Attorney

-16-

Form No. USA-33s-274 (Ed. 9-25-58)

=====================================================

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

=====================================================

UNITED STATES OF AMERICA

- v. -

OUMAR ISSA,
HAROUNA TOURÉ, and
IDRISS ABDELRAHMAN,

**Defendants.**

=====================================================

<u>INDICTMENT</u>

09 Cr.

(21 U.S.C. § 960a;18 U.S.C. § 2339B.)

<u>Preet Bharara</u>
United States Attorney.

A TRUE BILL

Foreperson.

_12/30/09 - Filed Indictment. Case Assigned to Judge Holwell_