UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

                           :

UNITED STATES OF AMERICA,

                           :           09 Cr. 1244 (BSJ)

    - v. -

                           :

OUMAR ISSA,

                           :

                    Defendant.

                           :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

<br>

## SENTENCING MEMORANDUM OF THE UNITED STATES

<br>

                                           PREET BHARARA
                                           United States Attorney for the
                                           Southern District of New York
                                           One St. Andrew's Plaza
                                           New York, New York 10007

<br>

Christian R. Everdell
Edward Y. Kim
Assistant United States Attorneys
      -Of Counsel-

## PRELIMINARY STATEMENT

The Government respectfully submits this memorandum in advance of sentencing for Oumar Issa ("Issa" or the "defendant"), currently scheduled for March 12, 2012. For the reasons set forth herein, the Government submits that the Guidelines calculation prepared by the Probation Department is correct, and that the terrorism enhancement is properly applied. Although the resulting Guidelines range is 292 to 365 months' imprisonment, because the statutory maximum punishment for an offense under Title 18, United States Code, Section 2339B, is fifteen years, the sentence is capped at 180 months. As set forth below, the Government respectfully submits that a sentence of 180 months' imprisonment is both a reasonable and appropriate sentence in this case.

## BACKGROUND

### A.    The Offense Conduct

This investigation was initiated by the Drug Enforcement Administration ("DEA") with the assistance of a confidential source ("CS-1"). CS-1 provided the DEA with information about potential narco-terrorist activity in West Africa. CS-1 posed as an individual of Lebanese descent who opposed the interests of the United States, Israel and, more broadly, the West and its ideals. (PSR ¶ 20). In August of 2009, CS-1 identified an individual known as "Oumar," who was subsequently identified by the DEA as Oumar Issa, the defendant, as a facilitator for a criminal organization operating within the West African countries of Togo, Ghana, Burkina Faso and Mali. CS-1 reported the information to the DEA and thereupon was instructed to arrange a meeting with Issa in Ghana, which CS-1 did, by telephone. (*Id.* ¶ 21).

On September 14, 2009, CS-1 met Issa in Ghana. During the meeting, CS-1 told Issa that he worked with "Colombians from the FARC," which he described as "a militia" and

"warriors."[1]  CS-1 explained to Issa that CS-1 and the FARC had "a common enemy . . . the Americans," and that the Americans were "after them."  (*Id.* ¶ 23; 9/14/09 Tr. at 5).  CS-1 also stated that "[t]hey [the Americans] changed our country . . . . they mess us up all over the place."  (9/14/09 Tr. at 6).  CS-1 also stated to Issa that the FARC and Al Qaeda were "struggling for the same, the same cause."  (*Id.* at 11).  In describing the proposed transaction, CS-1 told Issa that they shared the "same cause" and would also "make money."  (PSR ¶ 23; *see also* 9/14/09 Tr. at 25 (CS-1 tells Issa, "I . . . wanted to tell you that we are in . . . for the same cause . . . Don't forget that.")).  CS-1 also explained that the FARC needed assistance with transporting cocaine from West Africa, through North Africa, and into Spain.  (*Id.* ¶ 23).  To that end, CS-1 asked Issa if he was capable of providing secure passage for cocaine moving through North Africa.  (*Id.* ¶ 24).  Issa explained that he had associates in Mali, whom he described as "a network" of people with a "foothold . . . in the bush," who had weapons and who could "protect th[e] merchandise" as it passed through the desert.  CS-1 indicated to Issa that he also wanted to purchase weapons.  Issa responded, "in Mali there's nothing that's hard for us," and that it would not be "a problem."  (*Id.* ¶ 25).  Issa stated that he would travel to Mali to meet with a man who knew "the network" and who had "people in Spain" and "people in Morocco."  Issa further told CS-1 that, in addition to drug trafficking, this man helped "Hindus and Pakistanis" enter Spain via Morocco by providing them with fake passports.  CS-1 and Issa agreed that the two of them, joined by the individual referenced by Issa, would meet in Ghana soon to further discuss the details of the transaction.  (*Id.* ¶ 26).  At no point during this meeting or the later meetings on October 6, 2009

---

[1] As described in the PSR, the FARC is a designated foreign terrorist organization based in Colombia that is dedicated to the violent overthrow of the government of Colombia.  The FARC has engaged in numerous acts of violence against the United States and its interests, including murders and kidnappings of U.S. nationals.

discussed below, did Issa express any confusion about the FARC or any hesitation about participating in a large narcotics deal to benefit the FARC and its mission.

On September 15 and 16, 2009, CS-1 made a series of consensually monitored telephone calls at the direction of DEA, during which CS-1 and Issa further discussed the cocaine transportation proposal previously discussed on September 14, 2009.  Issa asked CS-1 for money to pay for his travel to Mali so that Issa could meet with the man referenced in the September 14, 2009 meeting and tell him about the business proposal with the Colombians.  CS-1 asked for Issa's full name in order to send him money via Western Union.  Issa provided his name, and the DEA arranged to have $300 sent to Issa in Togo to pay for Issa's travel to Mali.  During a call on September 15, 2009, CS-1 reminded Issa that he needed weapons and indicated that they would be used for his "kidnapping job," which had been briefly referenced at the September 14, 2009 meeting.  Issa responded that it would be "no problem."  (*Id.* ¶ 27).

On October 6, 2009, CS-1 had a series of meetings with Issa and an individual subsequently identified as Harouna Touré, in Accra, Ghana, to continue discussions regarding the proposed transport of cocaine through Africa.  Issa was present for some, but not all of the meetings.  Touré was introduced at the meeting as Issa's boss.  Touré indicated that he had agreed to meet with CS-1 to discuss Touré's ability to assist CS-1 and the Colombians with the transportation of cocaine from Ghana through North Africa to the coast of Spain.  (*Id.* ¶ 28).  During the meetings, CS-1 explained that he was meeting with Touré on behalf of a group of Colombians.  CS-1 explained that the Colombians needed assistance with the transportation of cocaine from Ghana to Morocco and then on to Spain.  (*Id.* ¶ 29).  Touré stated that he would be able to transport the cocaine from Ghana through North Africa to Spain.  While demonstrating with a map and making notations thereon, Touré discussed the various routes that he had used in

the past to transport merchandise through the desert from Mali to Morocco and other North African countries. Touré explained that he had people with weapons who could protect the transport of the cocaine across the desert, and that the drugs would be moved using 4x4 vehicles. (*Id.* ¶ 30). Touré also indicated that he was able to get official Malian passports. CS-1 provided Touré with a photo of a purported criminal associate (the "CA") and explained that the CA worked for the Colombians. CS-1 advised that the CA would follow along with Touré's group to ensure the safe delivery of the cocaine shipment. CS-1 paid Touré $1,000 for the future procurement of the passport for the CA. Touré stated that he would be able to obtain the CA's passport within 3-4 days after his return to Mali; however, Touré warned that he would only allow the CA to follow the drug load until the load reached Mali. (*Id.* ¶ 31).

Touré further stated that "[T]here are Islamists . . . bearded guys in there. They're in the bush. You've gotta give the chiefs something," indicating that these men needed to be paid in order for the drugs to move safely through the desert. CS-1 indicated that the Colombians "trust[ed] those people, because they [had] worked with them" in the past, and that they "hate[d] the Americans." (*Id.* ¶ 32). CS-1 also noted that the Americans were "on top of" the FARC; that the FARC members were "in hiding"; and that the FARC "like[d] to help [the Islamists] because they have the same…" (10/6/09 Tr. at 34, 49). CS-1 further indicated that those people (referring to the Islamists) were "our brothers" and shared "the same cause" as the Colombians. Touré responded that he understood, that those people were his "friends," and that he provided them with food and gas. (PSR ¶ 32).

At a later portion of the same meeting, which Issa did not attend, Touré indicated that he knew members of al Qaeda and stated that he gave them "fuel . . . food, everything." (*Id.* ¶ 32).

4

At a different meeting later that day, which Issa did attend, Touré further explained what was necessary to assure that the drugs would get across the desert. Touré stated, "You have to buy vehicles. You have to buy weapons. You have to buy men because in the bush, over there, those you call Tuaregs, those you call Arabs, they're all there." When CS-1 asked Touré if he had to pay "the Arabs . . . al Qaeda," Touré responded, "You pay all that, but the Arabs always, those people, you always [pay]." (*Id.* ¶ 33).

On November 17 and 18, 2009, CS-1 and an additional DEA confidential source posing as a member of the FARC ("CS-2") met with Touré and Idriss Abdelrahman in Ghana in meetings that were both audio and video recorded. Issa did not attend these meetings or any future meetings. During the course of these meetings, CS-1 explained that CS-2 was a member of the FARC and was wanted by the Americans. CS-1 also explained that CS-2 opposed American interests and that Touré and Abdelrahman were "fighting for the same cause." Touré and Abdelrahman agreed to transport cocaine for CS-2 and his group, and also discussed the possibility of doing additional deals together. Touré stated that he had connections with whom he worked to transport drugs across the desert. (*Id.* ¶ 34).

Eventually, Touré and Abdelrahman agreed to transport 50 kilos of cocaine as a test run. In the course of explaining how they would transport the cocaine, Abdelrahman stated that he was part of a group of eleven people, and Touré stated that he had networks with whom he worked. Abdelrahman and Touré also stated that they had "cars, the power and the weapons" and had "crews," "bases," and "units" that would support the transport of the cocaine. (*Id*. ¶ 35).

Touré and Abdelrahman subsequently agreed to purchase a truck to be used to transport the cocaine. Using money advanced to them by CS-1 and CS-2, Touré and Abdelrahman ultimately purchased the truck. (*Id*. ¶ 36).

On December 16, 2009, Touré and Abdelrahman were arrested by members of the Ghana Narcotics Control Board (NCB) in a hotel room in Accra, Ghana, along with Mohammed Touré, the nephew of Harouna Touré.  Issa was arrested later by the NCB at a different hotel in Accra, Ghana.  Issa, Touré, and Abdelrahman were later turned over to DEA agents.  (*Id*. ¶ 37).

On December 17, 2009, Issa was *Mirandized* and interviewed by DEA agents on the flight from Ghana to the Southern District of New York.  Among other things, *Issa* stated that: Touré is the "king of the desert" because Touré knows a lot of people; Touré has weapons and utilizes Tuaregs and Arabs to assist in the transportation of merchandise; and that Touré told CS-1 that his people would protect the narcotics as it went through the Salafist regions of North Africa.[2]

### B.    Issa's Guilty Plea

On November 15, 2011, the defendant pled guilty before Magistrate Judge Debra Freeman pursuant to a plea agreement.  The defendant pled guilty to Count Two of the Indictment, which charged him with conspiring to provide material support to the designated Foreign Terrorist Organizations the FARC, AQIM, and Al Qaeda.  During his plea allocution, the defendant admitted in part that he had agreed with others to assist in the transport of drugs on behalf of the FARC.

### C.    The Presentence Investigation Report

On March 2, 2012, the Probation Office issued its final Presentence Investigation Report ("PSR") in this case.  The PSR contains the same Guidelines calculation as the plea agreement, yielding an offense level of 35, a Criminal History Category of VI, resulting in a Guidelines

---

[2] The "Salafist regions of North Africa" is a clear reference to territory controlled by AQIM.  As discussed in the PSR, AQIM was formerly known as the Salafist Group for Preaching and Combat ("GSPC"), whose leadership later formally allied itself with Al Qaeda. (*See* PSR ¶ 16, 17).

range of 292 to 365 months' imprisonment, which is capped at 180 months as a result of the statutory maximum penalty for an offense under Title 18, United States Code, Section 2339B.  In determining the appropriate Guidelines range, the Probation Office also applied the terrorism enhancement pursuant to § 3A1.4 of the Guidelines.  (*Id.* ¶¶ 45, 55).  The Probation Office ultimately recommends a sentence of 60 months' imprisonment.  (*Id.* at 25).  The Probation Department noted in its justification for this recommendation that "[t]he defendant impressed upon the undersigned as being more concerned with making money, which CS-1 clearly indicated was the main goal of the offense, than targeting United States interests.  In essence, while Issa was convicted of a terrorism-related charge, his conduct appears more analogous to a defendant convicted in a narcotics-trafficking case."  (*Id.* at 26).

## ARGUMENT

### A.    The Governing Legal Framework

The Guidelines still provide strong guidance to the Court in light of *United States* v. *Booker*, 543 U.S. 220 (2005) and *United States* v. *Crosby*, 397 F.3d 103 (2d Cir. 2005).  Although *Booker* held that the Guidelines are no longer mandatory, it held also that the Guidelines remain in place and that district courts must "consult" the Guidelines and "take them into account" when sentencing.  543 U.S. at 264.  As the Supreme Court stated, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range"—that "should be the starting point and the initial benchmark."  *Gall* v. *United States*, 128 S. Ct. 586, 596 (2007).

After that calculation, however, a sentencing judge must consider seven factors outlined in Title 18, United States Code, Section 3553(a): "the nature and circumstances of the offense and the history and characteristics of the defendant," 18 U.S.C. § 3553(a)(1); the four legitimate

7

purposes of sentencing, *see id*. § 3553(a)(2); "the kinds of sentences available," *id*. § 3553(a)(3);

the Guidelines range itself, *see id*. § 3553(a)(4); any relevant policy statement by the Sentencing

Commission, *see id*. § 3553(a)(5); "the need to avoid unwarranted sentence disparities among

defendants," *id*. § 3553(a)(6); and "the need to provide restitution to any victims," *id.* §

3553(a)(7).  *See Gall* v. *United States*, 128 S. Ct. at 596 & n.6.

In determining the appropriate sentence, the statute directs judges to "impose a sentence

sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

(A)    to reflect the seriousness of the offense, to promote respect for the law, and to
provide just punishment for the offense;

(B)    to afford adequate deterrence to criminal conduct;

(C)    to protect the public from further crimes of the defendant; and

(D)    to provide the defendant with needed educational or vocational training, medical
care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

Courts may not presume that the appropriate sentence necessarily lies within the

applicable Guidelines range, but "the fact that § 3553(a) explicitly directs sentencing courts to

consider the Guidelines supports the premise that district courts must begin their analysis with

the Guidelines and remain cognizant of them throughout the sentencing process."  *Gall*, 128 S.

Ct. at 596 n.6.  Their relevance throughout the sentencing process stems in part from the fact

that, while the Guidelines are advisory, "the sentencing statutes envision both the sentencing

judge and the Commission as carrying out the same basic § 3553(a) objectives," *Rita* v. *United*

*States*, 127 S. Ct. 2456, 2463 (2007), and the Guidelines are "the product of careful study based

on extensive empirical evidence derived from the review of thousands of individual sentencing

decisions," *Gall*, 128 S. Ct. at 594; *see also Rita* v. *United States*, 127 S. Ct. at 2464.  To the

8

extent a sentencing court varies from the Guidelines sentence, "[it] must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." *Gall*, 128 S. Ct. at 597.

### B.    The Terrorism Enhancement Applies

The Government submits that the terrorism enhancement, found in the Guidelines at Section 3A1.4(a), plainly applies in this case, as the Probation Office correctly concluded. The Guidelines terrorism enhancement applies "[i]f the offense is a felony that involved, or was intended to promote, a federal crime of terrorism," *see* U.S.S.G. § 3A1.4(a), which is "an offense that—(A) is calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct; and (B) is a violation of—(i) section . . . 2339B (relating to providing material support to terrorist organizations) . . . ." 18 U.S.C. § 2332b(g)(5), cited in U.S.S.G. § 3A1.4, comment. (n.1); *see United States* v. *Awan*, 607 F.3d 306, 311 (2d Cir. 2010); *United States* v. *Salim*, 549 F.3d 67, 76-79 (2d Cir. 2008). Under the Guidelines, if the crime of conviction "is a felony that involved, or was intended to promote, a federal crime of terrorism," the sentencing court must increase the defendant's offense level by 12 or to level 32, whichever is greater, and must increase the defendant's Criminal History Category to VI. *See* U.S.S.G. § 3A1.4. The Second Circuit has recognized that "Congress and the Sentencing Commission had a rational basis for concluding that an act of terrorism represents a particularly grave threat because of the dangerousness of the crime and the difficulty of deterring and rehabilitating the criminal, and thus that terrorists and their supporters should be incapacitated for a longer period of time." *United States* v. *Meskini*, 319 F.3d 88, 92 (2d Cir. 2003).

In *United States* v. *Awan*, 607 F.3d 306 (2d Cir. 2010), the Second Circuit held that the two prongs of the terrorism enhancement—namely, the "involved" and "intended to promote" prongs—are independent and have separate meanings. "[A] defendant's offense 'involves' a federal crime of terrorism when his offense includes such a crime, *i.e.*, the defendant committed, attempted, or conspired to commit a federal crime of terrorism as defined in 18 U.S.C. § 2332b(g)(5), or his relevant conduct includes such a crime." *Id.* at 313-14; *see also United States* v. *Stewart*, 590 F.3d 93, 138 (2d Cir. 2009). With respect to the second prong, the Second Circuit has held that the "intended to promote" prong "applies where the defendant's offense is intended to encourage, further, or bring about a federal crime of terrorism, even though the defendant's own crime of conviction or relevant conduct may not include a federal crime of terrorism." *Awan*, 607 F.3d at 314.

Contrary to the defendant's claim, Issa's agreement to help the FARC transport cocaine satisfies the "involved" prong identified in *Awan*. First, the statute at issue—material support to a terrorist organization—is an enumerated statute under 18 U.S.C. § 2332b(g)(5). Second, the crime of material support to the FARC as charged here constituted an offense calculated to influence or affect or to retaliate against the conduct of a government. As CS-1 explained to Issa during their meetings, the FARC was a militia that considered the Americans an enemy (PSR ¶ 23); the Americans were "on top of" the FARC (10/6/09 Tr. at 34); the Americans had "changed [their] country" and had messed them up "all over the place" (9/14/09 Tr. at 6); the FARC was engaged in illegal activities such as narcotics trafficking and kidnapping (*see, e.g.*, 9/14/09 Tr. at 6-7, 32-33); and that, by facilitating the narcotics transport, Issa would be sharing a common cause with the FARC to strike back at the United States (PSR ¶ 23).

10

Furthermore, to the extent that there was any ambiguity about whether the offense involved retaliation against government conduct, CS-1 specifically linked the FARC's anti-American agenda to the agenda of Al Qaeda and AQIM—entities with a well-established and widely known anti-U.S. agenda of which the defendant was certainly aware.  For instance, during their meeting on September 14, 2009, CS-1 stated to Issa that the FARC and Al Qaeda were "struggling for the same, the same cause."  (9/14/09 Tr. at 11).  In addition, during their meeting on October 6, 2009, CS-1 made clear to Issa that the FARC had worked with the Islamists (referring to AQIM) in the past and shared "the same cause" as the Islamists.  (PSR ¶ 32).

Thus, even accepting Issa's representation that he was completely ignorant about the FARC prior to his meetings with CS-1, it was made clear to Issa that the support to the FARC which Issa agreed to provide would assist the FARC's cause—including its efforts to impact and retaliate against the United States.

Defense counsel argues that the offense did not involve a federal crime of terrorism because Issa did not calculate his actions to influence government conduct.  However, as the Second Circuit made clear in *Awan*, the terrorism enhancement "does not focus on the defendant but on his 'offense,' asking whether it was calculated, *i.e.*, planned—for whatever reason or motive—to achieve the stated object."  *Awan*, 607 F.3d at 317.  Thus, the commission of an enumerated crime "satisfies the involved prong of the terrorism enhancement so long as the government shows by a preponderance of the evidence that [the defendant] had the specific intent to commit an *offense* that was calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct."  *Id.* (internal quotation marks and citations omitted) (emphasis added); *see also United States* v. *Cromitie*, No. 09 Cr.

11

558 (CM), 2011 WL 2693923, at *5 (S.D.N.Y. June 29, 2011) ("The defendant's motive is simply not relevant.  Rather, the relevant question is whether the defendant knew that the offense was so calculated.") (internal quotations and citations omitted).

Accordingly, the offense to which Issa pled guilty—agreeing to support the FARC by facilitating the transport of drugs for the FARC—is a felony that "involved . . . a federal crime of terrorism" within the meaning of Section 3A1.4.  It was calculated to provide support to the FARC, which Issa was told was a militia with an anti-American agenda, and which Issa necessarily understood would, in turn, use such support to commit acts—including kidnappings, and more broadly, armed conflict—to influence the conduct of the U.S. government by intimidation or coercion and to retaliate against the U.S. government for its work against the FARC.[3]

C.      The Court Should Impose a Sentence of 180 Months

In the present case, a sentence of 180 months' imprisonment would be sufficient, but not greater than necessary, to comply with the purposes of sentencing.  The defendant pled guilty to conspiring to provide material support to a designated terrorist foreign terrorist organization. While it is true, as defense counsel points out, that Issa is not alleged to have been a FARC member or an ideological sympathizer, it is undisputed that Issa agreed to transport a large

---

[3] Defendant's alternative argument that the Court should grant a downward departure on the grounds that the terrorism enhancement overstates his prior criminal history should be rejected.  Under the terms of the plea agreement, defense counsel is permitted to argue that the terrorism enhancement does not apply, but is prohibited from arguing for any downward departure, including a departure on the grounds that the Guidelines range overstates the defendant's criminal history.  Regardless, a downward departure would not be warranted from the defendant's resulting Criminal History Category of VI.  *See United States* v. *Meskini*, 319 F.3d 88, 92 (2d Cir. 2003) ("Considering the serious dangers posed by all forms of terrorism, the Guidelines are in no way irrational in setting the default for criminal history at a very high level, with downward departures permitted in *exceptional* cases.") (emphasis added).

quantity of narcotics to assist the FARC, knowing full well that the FARC espoused an anti-American agenda and was engaged in terrorist activities.

The defendant's crime falls squarely within the class of criminal activities that Congress sought to prohibit when it enacted the Material Support statute. The Congressional findings accompanying the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which enacted Section 2339B, are revealing. They state in part that "international terrorism is a serious and deadly problem that threatens the *vital* interests of the United States." Pub. L. 104-132, Sections 301(a)(1) (emphasis added). Similarly, Congress found that "foreign organizations that engage in terrorist activity are so tainted by their criminal conduct that any contribution to such an organization facilitates that conduct." Pub. L. 104-132, Sections 301(a)(7).

Consistent with its findings about the seriousness of providing support to designated terrorist organizations, Congress did not require that the provider of support share the ideological goals of the terrorist organization. And this clearly was not an oversight. While it is true that terrorist organizations such as the FARC, Al Qaeda, and AQIM derive some portion of their support from ideological sympathizers, it is equally true that these organizations receive crucial support from individuals such as the defendant, who provide their support in the opportunistic pursuit of financial gain. Regardless of the motivation, however, the same effect is achieved. The terrorist organization gains additional resources to further its terrorist activities. Accordingly, whether the defendant was motivated by ideology or financial gain, his offense is equally serious, and a sentence of 180 months in this case would adequately reflect the seriousness of the defendant's crime.

For the same reason, the Government respectfully submits that the Probation Office's recommended sentence of 60 months' imprisonment is misguided. Even assuming that the

13

defendant was more concerned with financial gain than targeting the United States, the defendant was convicted of committing an offense that has no requirement that the offender share in the ideological goals of the terrorist organization to which he gave support. In addition, notwithstanding the simple upbringing described by defense counsel, Issa was prepared to facilitate a transnational offense involving the transport of large quantities of narcotics through several countries. Moreover, this was not Issa's first foray into criminal activity. As the transcripts make clear, Issa had been involved in prior smuggling operations and with people other than Touré. (*See* 9/14/09 Tr. at 28-31 (referencing previous work with "El Hajji" and "Chérif")). Issa also expressed his willingness to procure weapons for CS-1 to facilitate kidnappings. (*See* 9/15/09 Tr. at 4).

Issa also played a crucial role in the offense by introducing CS-1 to Harouna Touré, whom Issa described as the "king of the desert." (PSR ¶ 38(a)). During his first meeting with CS-1, Issa demonstrated his familiarity with Touré's criminal activities by speaking in detail about Touré's access to a network across North Africa that could facilitate the shipment of narcotics and Touré's prior involvement in human trafficking. These were not empty words. Touré trusted Issa enough that he agreed to meet CS-1, and during those meetings, Touré spoke in depth about his experience with international smuggling operations involving both narcotics and human trafficking. In short, it is significant that Issa had direct access to a man who was able to provide the criminal services purportedly being sought by the FARC and reflects on Issa's own experience with criminal activities.

Moreover, even accepting the Probation Office's premise that Issa's conduct is more analogous to that of a defendant convicted in a narcotics trafficking case, the sheer quantity of narcotics involved in this case—hundreds of kilograms of cocaine (*see, e.g.*, 10/6/09 Tr. at 4

14

("[W]e're talking five hundred or a thousand [kilos], you understand?")—counsels in favor of a Guidelines sentence. Indeed, a narcotics importation offense involving these quantities would have resulted in a Guidelines range of 168 to 210 months' imprisonment.

A sentence of 180 months in this case also would facilitate general deterrence. The Material Support statute is aimed at individuals who knowingly provide support to designated terrorist organizations. The defendant's conduct in this case makes clear why this is so. The defendant and his co-conspirators were willing to engage in illegal activities that they knew would inure to the benefit of the FARC, Al Qaeda, and AQIM. Such terrorist organizations rely on people like the defendant to provide resources and support across the world. A Guidelines sentence in this case is necessary to deter like-minded individuals who may believe that it is permissible to support terrorist organizations even if they do not consider themselves ideologues or terrorists.

Defense counsel points to instances in which other courts have granted substantial downward variances in cases where the terrorism enhancement has been applied. The applicable Guidelines sentence in this case is 180 months, reflecting the statutory maximum sentence for a violation of 18 U.S.C. § 2339B. Absent that statutory constraint, the applicable Guidelines range would be 292 to 365 months' imprisonment—significantly more than what Issa now faces. Thus, a Guidelines sentence in this case is already significantly lower than what the recommended sentence after application of the terrorism enhancement otherwise would have been.

Defense counsel also cites other cases in this District involving the FARC in which defendants received sentences of 15 years' imprisonment, and argues that those cases demonstrate that the statutory maximum for material support charges has been reserved for

15

defendants who "adopted and acted upon the FARC's terrorist ideals." (Def. Mem. at 15).

Defense counsel's reliance on these cases is misplaced. As an initial matter, in *United States* v.

*Rengifo*, 09 Cr. 109 (JSR) (Rakoff, J.), the defendant Alejandro Rengifo, a FARC member, was

not convicted of a material support offense but rather pled guilty to conspiracy to engage in

hostage taking and substantive hostage taking. Moreover, Rengifo argued that he was forcibly

conscripted into the FARC at a young age, and Judge Rakoff considered Rengifo's claims of

duress and coercion as mitigating factors at sentencing. In *United States* v. *Banol Ramos*, 09 Cr.

498 (WHP) (Pauley, J.), the defendant, a member of the FARC who provided security for a

cocaine load and engaged in a firefight with Panamanian law enforcement officers, was

sentenced for providing material support to the FARC. While Judge Pauley ultimately sentenced

Banol-Ramos to 15 years' imprisonment he also noted that "if it were in my power, I'd impose a

longer sentence. But my power is limited by Congress and the law." (9/16/11 Sentencing Tr. at

6). Finally, in *United States* v. *Cordoba-Bermudez*, 08 Cr. 1290 (DC), Judge Chin sentenced the

defendant—who was not a member of the FARC—to 15 years' imprisonment for providing

material support to the FARC. Contrary to defense counsel's claim, there was no assertion that

the defendant's support was motivated by ideological concerns. Rather, during sentencing, the

defendant claimed that he was motivated by fears that the FARC would kill him and his family.

(6/1/11 Sentencing Tr. at 10, 24). Accordingly, the cases cited by defense counsel do not support

the proposition that Issa should be given a non-Guidelines sentence.

In sum, a Guidelines sentence of 180 months is warranted in this case. Issa agreed to

help transport hundreds of kilograms of cocaine for a terrorist organization that Congress has

deemed to threaten the vital interests of the United States. And he did so knowing that his efforts

were calculated to further the FARC's efforts against the United States. Such a sentence would

16

reflect the seriousness of the offense, provide just punishment, afford adequate deterrence, and

would be sufficient, but not greater than necessary to serve the purposes of sentencing.

## CONCLUSION

For the foregoing reasons, the Government respectfully submits that the defendant should

be sentenced to a Guidelines sentence of 180 months' imprisonment.

Dated: New York, New York
       March 6, 2012

Respectfully submitted,

PREET BHARARA
United States Attorney for the
Southern District of New York

By: _____/s/_____
    Christian R. Everdell / Edward Y. Kim
    Assistant United States Attorneys
    Tel: 212-637-2556 / 2401
    Fax: 212-637-0097

17

**AFFIRMATION OF SERVICE**

CHRISTIAN R. EVERDELL, pursuant to Title 28, United States Code, Section 1746,

hereby declares under the penalty of perjury:

That I am an Assistant United States Attorney in the Office of the United States Attorney

for the Southern District of New York.  That, on March 6, 2012, I caused a copy of the

Sentencing Memorandum of the United States to be delivered by ECF and electronic mail to:

> Julia Gatto, Esq.
> Julia_Gatto@fd.org

I declare under penalty of perjury under the laws of the United States of America that the

foregoing is true and correct.

Dated: New York, New York
       March 6, 2012

                              _____/s/_____
                              Christian R. Everdell
                              Assistant United States Attorney
                              (212) 637-2556